UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| In re<br><br>**SPORT LAND, INC.,**<br><br>Debtor. | Case No. **08-61395-11** |

*MEMORANDUM OF DECISION*

At Butte in said District this 6th day of March, 2009.

After due notice, hearing was held at Missoula on January 16, 2009, on the motion to modify stay[1] filed on October 22, 2008 (Docket No. 24), by Textron Financial Corporation ("Textron"), and Debtor's objection thereto. Textron was represented at the hearing by attorney Matthew J. Cuffe of Missoula, Montana. The Debtor was represented by attorney Harold V. Dye of Missoula. Debtor's vice president William Scullion ("Scullion") testified. Debtor's Exhibits ("Ex.") A, A-1, and Textron's Ex. 1, 3, 4, 5, 6, 7, 8, and 9, all were admitted into evidence without objection. At the conclusion of the parties' cases-in-chief the Court took Textron's motion under advisement. After review of the record and applicable law, the matter is ready for decision. For the reasons set forth below, Textron's motion to modify stay is denied.

This Court has jurisdiction in this Chapter 11 case under 28 U.S.C. § 1334(a). Textron's motion to modify stay is a core proceeding under 28 U.S.C. § 157(b)(2)(G). This Memorandum

---

[1]Textron's motion to modify stay was combined with a motion to prohibit use of cash collateral and require segregation, for an accounting of cash collateral sold-out-of-trust units. Docket No. 24. Textron's motions to prohibit use of cash collateral, for an accounting and segregation were the subject of the Court's Order entered on October 27, 2008, Docket No. 40, which noted that the Debtor has established a separate cash collateral account for Textron at Farmers State Bank.

includes the Court's findings of fact and conclusions of law.

## FACTS

Sport Land is in the business of selling trailers. Scullion is the vice president of Sport Land and is familiar with its finances. He testified that the Debtor's business selling trailers makes a profit.

Sport Land owns no real property. Scullion owns real property in Manhattan, Montana, and Lolo, Montana, which he leases to Sport Land to operate its business. Scullion testified that Sport Land has a written 3 year lease with him for the premises in Manhattan and Lolo, which was produced in discovery, and which includes insurance, taxes and some maintenance. Sport Land also operated at a Kalispell, Montana, location until it was closed. Scullion testified that Sport Land's operations at the Manhattan operation cost $30,000 per month.

Sport Land has operated at its Manhattan store for two years. Scullion testified that he has equity in his Manhattan property, which was appraised two years ago at a value of just under $1 million, and which he listed for sale for six months at a price of $1.36 million. He owes just under $800,000 on the Manhattan property.

Ex. 1[2] is a wholesale security agreement between Textron and Sport Land, signed by Scullion and dated, it appears, December 15, 1998. Further down on Ex. 1 is the signature of Sport Land's president Brian Meidinger, dated 3/13/2000. The second to last page of Ex. 1 has Meidinger's signature dated 8/26/2006. Scullion testified that he signed Ex. 1 in 2000, but he was not aware of Meidinger's later signatures on Ex. 1, and was not aware of any UCC-1 financing statements.

Ex. 3 is a Montana UCC-1 financing statement, dated 3/23/2000, naming Sport Land as

---

[2]Much of Textron's Ex. 1, found at Docket No. 69, is illegible.

the debtor and Textron as secured party, and listing Sport Land's equipment and inventory, and other assets, in the description of security, including proceeds. Scullion testified that Ex. 3 secured Textron in the inventory and proceeds, but that Ex. 3 was released in 2005 and subject to a refinancing loan which Sport Land obtained from First Security Bank. This testimony was uncontroverted.

Scullion identified Ex. 4 as amendments to the UCC-1's listing Textron's security. Ex. 4 changed Sport Land's name to Sportland[3]. Ex. 4 states that it relates back to the UCC-1 shown on Ex. 3, and it restates the collateral description. Textron and GE Commercial Distribution Finance Corporation ("GE") entered into an "Intercreditor Agreement" dated 10/24/2007, Ex. 6, which includes a "Collateral Subordination Agreement listing model numbers, serial numbers and amounts. Ex. 6 provides that Textron subordinates its present and future security interests in the collateral to the perfected first prior security interest of GE to extend credit to Sport Land.

Scullion testified that Sport Land obtained refinancing from First Security Bank, and that as a result of that refinancing all the old floor financing documents with Textron and GE were terminated[4]. Scullion testified that he has releases from Textron of his personal liability to Textron, but those were not produced at hearing or admitted into evidence.

Sport Land suffered losses from a fire at its Manhattan location. Sport Land initiated a lawsuit based on an insurance claim, and also sued the manufacturer of a refrigerator which allegedly caused the fire. Scullion testified that Sport Land was paying an expert witness $6,000

---

[3] Scullion testified that Sport Land's articles of incorporation show Sport Land's name as two words, while on its tax returns it is stated as one word.

[4] On redirect examination by Textron's counsel who asked who told him there was an issue regarding Textron's security agreements, Scullion testified that a Mr. Strauss told him Sport Land had a possible claim.

3

to prepare for Sport Land's lawsuit.

During the two months prior to the filing of Sport Land's Chapter 11 petition, Scullion admitted that Sport Land operated at a loss. He testified that the loss included an $18,000 charge off against Sport Land's operating budget as a result of its closing its Kalispell location.

Scullion testified that Sport Land's agreement with Textron allowed Sport Land 5 days after a sale of Textron's collateral to pay Textron. Sport Land allowed Textron to inspect its security, and Scullion testified that Textron inspected it monthly. Scullion testified that one day Textron's service representative came to Sport Land and demanded payment for its units on the same day of any sale. He testified that Sport Land resisted Textron's demand because it needed a few days to verify the serial numbers of the units of Textron's security, and Textron's demand for same day payment did not given it the chance to verify serial numbers.

On cross examination Scullion testified that he agreed to pay Textron within 5 days of the sale, but on the advice of counsel Sport Land did not follow through and pay Textron within 5 days. Scullion testified that Sport Land paid Textron approximately $50,000 a week before it filed its Chapter 11 petition, with the understanding that Textron would not pursue legal remedies against Sport Land. He testified that Textron accepted the $50,000 payment but then sued Sport Land anyway, which caused Sport Land to file its bankruptcy petition. Sport Land filed its Chapter 11 petition on October 6, 2008.

As a result, Scullion testified, certain units of Textron's security were sold pre-petition without paying Textron, and Sport Land deposited the sale proceeds and paid its operating expenses. Scullion admitted that Textron has not been paid for those units. Ex. 7 dated 10/29/2008, is a list derived from Sport Land's QuickBooks computer software of Sport Land trailers and toppers sold between June 2008 through October 27, 2008, including the price, cost

4

and profit margin percentage. Scullion testified that Sport Land's average return from its inventory shown by Ex. 7 was 26.64 percent. When asked about the values assigned by Sport Land to its inventory, Scullion testified that Sport Land calculates the profit by deducting freight charges for its inventory, which on some units could be as high as $1,000.

Scullion testified that the Debtor received $196,000 from the sale of Textron's security units, some of which it used to pay some payables which were behind. He testified that Sport Land's purchase agreements include the date of manufacture of the trailers, and that Sport Land's employees generally tell purchasers the date of manufacture.

Debtor's Schedule B lists Textron's floored inventory, at item no. 30 listed in the amount of $739,384.57. Scullion testified that the value listed on Schedule B is not the same as the market value of the Debtor's Textron inventory. He estimated that the fair market value of the Debtor's Textron inventory is between 15 to 35 percent higher than the invoice price. At item no. 31 Schedule B lists a claim in the amount of $500,000 described as "Manhattan fire loss."[5]

Schedule D lists Textron's claim in the amount of $935,994.93 secured by floored inventory valued in the amount of $739,384.51, leaving an unsecured portion in the amount of $196,610.42. At the hearing Scullion agreed that Textron's claim of $936,305.81 is "pretty correct" and agreed that on the petition date Textron was slightly oversecured.

Textron filed its motion to modify stay combined with other motions, Docket No. 24, on October 23, 2008. Textron's motion states at paragraph 2g that it subordinated its security interest in certain inventory to Farmers State Bank, and subordinated its security interest in other security to GE. Textron alleges that the Debtor failed to make payments to Textron for collateral

---

[5]Scullion testified on redirect examination by Textron's attorney that he believes the Debtor's claim based on negligence of its insurance agent was disclosed on the Debtor's Schedules.

sold out of trust in the amount of $190,601.30. Textron's motion to modify stay is based on 11 U.S.C. § 362(d)(1) for "cause," including lack of adequate protection, and under § 362(d)(2) because the Debtor lacks equity and the collateral is not necessary for an effective reorganization.

After a hearing was held on Textron's motion to prohibit use of cash collateral and for an accounting, the Court on October 27, 2008 (Docket No. 40) ordered the Debtor to continue depositing Textron's cash collateral into a separate cash collateral account for Textron. The time periods imposed by 11 U.S.C. § 362, were waived for cause as noted in this Court's order of November 14, 2009 (Docket No. 56). Scullion testified that the Debtor has complied with the Court's Order and segregated the invoice price for Textron's security units in a separate cash collateral account for Textron. He testified that the Debtor has disbursed funds at Textron's request from the cash collateral account to Textron, and that it is trying to adhere to a two week cycle. Scullion testified that the Debtor has a 3 to 5 day period for purchase funds to clear, after which Debtor transfers the amount of proceeds shown by Textron's schedule, which may or may not be the invoice amount, into the Textron cash collateral account. Any surplus in proceeds over the amount shown by Textron's schedule, Scullion testified, is kept in the Debtor's DIP account. Scullion agreed to continue treating Textron and GE in accordance with the Court's cash collateral Order until their status as secured creditors is determined. He testified that Sport Land wants the liquidation of Textron's collateral to be orderly, and he personally needs to defend himself.

Ex. A is Sport Land's compilation of trailer sales, cost, sale price and margins for 2008 sales. Scullion testified that Ex. A shows an average profit margin of 26.64 percent[6], and that the margin on horse trailer sales is 15.5%.

---

[6]The 26.64% margin is highlighted on the third page of Ex. A, filed with Docket No. 51.

Scullion testified that he has received rent from Sport Land in the amount of $8,200, and that he still receives rent but at the reduced amount of $5,500, which represents the amount of interest due on his mortgage. Scullion testified that the Debtor is no longer paying him rent for the Debtor's lease of the Manhattan location, and that he told the Debtor that it did not have to pay. The Debtor currently allows a church group use the Manhattan location for $2,500 per month.

Scullion testified that Sport Land's lawsuit includes an insurance claim valued at approximately $500,000, and that the lawsuit has been filed[7]. Sport Land's lawsuit is based on claims for loss of income and loss of business. In addition, Scullion testified, Sport Land has a professional negligence claim against its insurance agent, identified as Paine Financial, based upon the agent's negligence in failing to advise Sport Land of the proper amount of insurance it should retain. He testified that the net insurance recovery claim will not pay off Textron and GE.

Scullion testified that the $500,000 loss figure was calculated by a professional business analyst employed by the Debtor, who calculated Sport Land's loss at the time of the fire. Currently, Scullion testified, the professional's evaluation of Sport Land's loss of business and business interruption has grown to $850,000. If Sport Land's loss from the fire increases to $1 million, Scullion testified, and Sport Land recovers only $500,000 from the refrigerator manufacturer, it will proceed against Paine Financial to recover the rest of its loss because it was the same damage. Sport Land's lawsuit is subject to a 40 percent contingency fee for its attorney, and the insurance company is paying the costs. When asked whether a $300,000 net recovery from the claim was possible he answered that it could be more or less than $300,000.

---

[7]Scullion testified that he personally suffered a loss from the fire, and also that Motor Home Insurance Company is another plaintiff in the lawsuit suing Domestic Refrigeration.

Scullion testified that the Debtor could not pay Textron in full if its inventory were liquidated immediately, but that it could pay Textron in an orderly sale through its Plan. Scullion testified that he plans to[8] contribute $30,000 of his own funds to the Debtor to make its reorganization successful, and that other investors will contribute additional funds[9] to purchase trailers to sell. Scullion testified that the reorganized Debtor will no longer sell inventory which is subject to floor financing arrangements. However, he testified that the Debtor needs Textron's trailers to sell because the Debtor is not yet reorganized, and further he does not see how Sport Land can reorganize without being able to sell Textron's floored inventory in an orderly manner. He testified that he and Sport Land tried negotiating with Textron about surrendering to Textron its inventory, but Textron replied that it would result in huge shortfalls in the amounts it is owed, which Scullion estimated would be approximately $225,000.

Instead of such a huge deficiency, Scullion testified, the Debtor seeks an orderly liquidation of Textron's floored inventory, which he estimated would take between twelve to eighteen months in order to get the best price in accordance to their historic margins as shown on Ex. A. He testified at the hearing date that it was the worst time of the year for Sport Land's sales, and that there is a fifty percent difference in sales during the summer versus winter. Textron's counsel asked Scullion on redirect examination what the margins will be on Textron's trailers if the Debtor is allowed to reorganize with them, and he responded that Sport Land

---

[8] Scullion testified that GE attempted to continue binding arbitration against him. Adversary Proceeding No. 09-00007 was initiated by Sport Land against GE seeking an injunction, to recover preferences and to determine that GE is an unsecured creditor due to the termination of GE's financing documents when Sport Land refinanced with Farmers State Bank. After a hearing the Court entered a preliminary injunction, Docket No. 17, granting Sport Land's motion and enjoining GE from proceeding with arbitration against Scullion and others.

[9] Scullion did not identify the other private investors, but testified that the Debtor has commitments from new investors.

should realized a profit margin from $250,000 to $300,000 on Textron's trailers.

## DISCUSSION

> Under 11 U.S.C. § 362(a), "[a] bankruptcy filing imposes an automatic stay of all litigation against the debtor." *Christensen v. Tucson Estates, Inc. (In re Tucson Estates, Inc.)*, 912 F.2d 1162, 1166 (9th Cir. 1990) (citing 11 U.S.C. § 362(a)), except in those cases specifically enumerated in § 362(b). The automatic stay is one of the fundamental debtor protections provided by the bankruptcy laws. It gives debtors a breathing spell from creditors. It stops all collection efforts, all harassment, and all foreclosure actions. It permits debtors to attempt a repayment or reorganization plan, or simply to be relieved of the financial pressures that drove them into bankruptcy. S.Rep. No. 989, 95th Cong., 2d Sess. 54-55 (1978), *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5840-41.

*In re Mittlestadt*, 20 Mont. B.R. 46, 51 (Bankr. D. Mont. 2002), quoting *In re Westco Energy, Inc.*, 18 Mont. B.R. 199, 211-12 (Bankr. D. Mont. 2000).

Textron's motion to modify stay is based on 11 U.S.C. § 362(d)(1) for "cause," and § 362(d)(2) alleging that Debtor does not have an equity in Textron's collateral and the collateral is not necessary for an effective reorganization. Under 11 U.S.C. § 362(g), a creditor has the burden of proving that a debtor does not have equity in property, while the debtor has the burden of proof on all other issues to show that the stay should not be modified. *Mittlestadt*, 20 Mont. B.R. at 52; *In re Hungerford*, 19 Mont. B.R. 103, 133-34 (Bankr. D. Mont. 2001).

Textron's motion is based on both §§ 362(d)(1) and (d)(2). Turning first to § 362(d)(2), the Court finds that the Debtor has satisfied its burden of proof by uncontroverted evidence that Textron's collateral is necessary to the Debtor's effective reorganization under § 362(d)(2)(B). *Hungerford*, 19 Mont. B.R. at 133-34. Scullion's testimony that the Debtor uses the profit derived from the sale of Textron's collateral, shown by Textron's Ex. 7 as well as Debtor's Ex. A, is uncontroverted. The Debtor uses such profit for its operating expenses, and to pay Textron

9

the invoice price into Textron's segregated cash collateral account. The evidence shows that without Textron's collateral the Debtor would not only lose that profit margin used for its operating expenses, but would also suffer a deficiency to Textron in the amount of $225,000. Textron offered no evidence that the Debtor is incapable of an effective reorganization, toward which Scullion testified that he and other investors are contributing new capital. Because the Debtor satisfied its burden under § 362(g)(2) and § 362(d)(2)(B), Textron's motion based on § 362(d)(2) must be denied and it is not necessary to determine whether the Debtor has an equity in the property under § 362(d)(2)(A).

Next, § 362(d)(1) allows for the granting of relief from the automatic stay "for cause, including the lack of adequate protection of an interest in property of such party in interest[.]" This Court explained the standard for modifying the stay for "cause" under § 362(d)(1) in *Westco*:

> Section 362(d), however, provides that, "[o]n request of a party in interest and after notice and a hearing, the court shall grant relief from the [automatic] stay" in three instances. The subsection relevant to these proceedings is § 362(d)(1), which allows for the granting of relief from the automatic stay "for cause". What constitutes cause for purposes of § 362(d) "has no clear definition and is determined on a case-by-case basis." *Tucson Estates*, 912 F.2d at 1166. *See also Little Creek Dev. Co. v. Commonwealth Mortgage Corp. (In the Matter of Little Creek Dev. Co.)*, 779 F.2d 1068, 1072 (5th Cir. 1986) (Relief from the automatic stay may "be granted 'for cause,' a term not defined in the statute so as to afford flexibility to the bankruptcy courts.").

*Westco*, 18 Mont. B.R. at 211-12.

Section 362 vests this Court with wide latitude in granting appropriate relief from the automatic stay, and a decision to lift the automatic stay is within a bankruptcy court's discretion, and subject to review for an abuse of discretion. *In re Delaney-Morin*, 304 B.R. 365, 369-70 (9th Cir. BAP 2003); *In re Leisure Corp.*, 234 B.R. 916, 920 (9th Cir. BAP 1999); *In re Plummer*, 20

Mont. B.R. 468, 477-78 (Bankr. D. Mont. 2003); *Mataya v. Kissinger (In re Kissinger)*, 72 F.3d 107, 108-109 (9th Cir. 1995).  As the party seeking relief, Textron must first establish a prima facie case that cause exists for relief under § 362(d)(1).  *United States v. Gould (In re Gould)*, __ B.R. __, 2009 WL 465599, * 7 (9th Cir. BAP); *Duvar Apt., Inc. v. FDIC (In re Duvar Apt., Inc.)*, 205 B.R. 196, 200 (9th Cir. BAP 1996).  Once a prima facie case has been established, the burden shifts to the debtor to show that relief from the stay is not warranted. § 362(g)(2).  *Gould*, 2009 WL 465599 at * 7; *Duvar Apt.*, 205 B.R. at 200.

   Lack of adequate protection is one example of cause for relief from stay.  *In re Ellis*, 60 B.R. 432, 435 (9th Cir. BAP 1985); *In re Avila,* 311 B.R. 81, 83 (Bankr. N.D. Cal. 2004).  An equity cushion may provide adequate protection even though not a single mortgage payment has been made.  *Avila,* 311 B.R. at 83; *In re Mellor*, 734 F.2d 1396, 1400 (9th Cir.1984).  In *Avila* the court found the mortgagee was adequately protected by an equity cushion of 40%. 311 B.R. at 83.  The court noted that "[w]here a creditor is adequately protected by a large equity cushion, the debtor would suffer a substantial loss in the event of foreclosure, and no economic harm to the creditor would result, relief from stay should not automatically follow a default in payment." *Avila,* 311 B.R. at 84; *see In re McCollum*, 76 B.R. 797, 799 (Bankr. D. Or.1987).

   The evidence admitted at the hearing shows that Sport Land sold units purported to be Textron's security out of trust for $196,000, which it did not immediately pay to Textron.  On the other hand an unresolved issue regarding whether Textron's security interest continued in effect exists.  Textron's motion states that it subordinated its security interest, and Scullion's uncontroverted testimony is that Sport Land's security agreements with Textron were terminated when Sport Land refinanced with First Security Bank.  Textron did not satisfy its burden under § 362(d)(1) because the issue of whether its security interests remain in place is in dispute.

11

With respect to Textron's contention that it lacks adequate protection, the evidence shows to the contrary that Textron is adequately protected only while the Debtor conducts an orderly liquidation of Textron's purported collateral. Textron's Ex. 7 and Ex. A show that the Debtor can sell Textron's units at a profit over Textron's invoice price, while if the units are surrendered the result according to Scullion is a $225,000 deficiency. Scullion testified that Textron's collateral is not diminishing in value, while Textron did not offer testimony by a qualified expert to the contrary. Scullion testified that the Debtor will propose an orderly plan to liquidate Textron's collateral over the course of 12 to 18 months, which will result in payment to Textron of the cost of its collateral and profit for the Debtor to reorganize.

Despite the dispute over Textron's secured status the Debtor continues to deposit the amount of Textron's invoice price from sales into its segregated cash collateral account, and to pay Textron at regular intervals, while the Textron units are sold in an orderly fashion at retail pursuant to the Debtor's reorganization. Textron is therefore adequately protected. Considering all the evidence, the Court finds and concludes that Textron failed to show sufficient "cause" under § 362(d)(1) to modify the stay.

## CONCLUSIONS OF LAW

1. This Court has original and exclusive jurisdiction over this Chapter 11 bankruptcy case under 28 U.S.C. § 1334(a).

2. Textron's motion to modify stay is a core proceeding under 28 U.S.C. § 157(b)(2)(G).

3. The Debtor satisfied its burden of proof under 11 U.S.C. §§ 362(d)(1) & (g)(2) to show that Textron's motion to modify stay should not be granted.

4. The property which is allegedly Textron's collateral is necessary for Debtor's effective reorganization under 11 U.S.C. § 362(d)(2)(B).

**IT IS ORDERED** a separate Order shall be entered in conformity with the above sustaining the Debtor's objection and denying the motion to modify stay filed on October 22, 2008 (Docket No. 24), by Textron Financial Corporation.

BY THE COURT

/s/ Ralph B. Kirscher
HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana